**Harold L. MYRON**

v.

**TRUST COMPANY BANK LONG TERM DISABILITY BENEFIT PLAN, Trust Company Bank, and Great West Life Assurance Company.**

Civ. A. No. C80–1428A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Sept. 15, 1981.

Jerry L. Sims, Lefkoff, Pike, Fox & Sims, Atlanta, Ga., for plaintiff.

Charles M. Shaffer, Jr., King & Spalding, J. D. Fleming, Jr., and John H. Fleming, Sutherland, Asbill & Brennan, Atlanta, Ga., for defendants.

### ORDER

ORINDA D. EVANS, District Judge.

This action under The Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*, and the Court's pendent jurisdiction, is before the Court on plaintiff's motion to amend his complaint, defendants Trust Company Bank Long Term Disability Benefit Plan and Trust Company Bank's (hereinafter "the Bank") motion for summary judgment, defendant Great West Life Assurance Company's (hereinafter "Great West") motion for summary judgment and plaintiff's cross-motion for summary judgment.

### Motion to Amend

Defendants have filed no response to plaintiff's motion to amend the complaint. The Court therefore FINDS that this motion is unopposed and hereby GRANTS plaintiff's motion. Local Rule 91.2.

### Motions for Summary Judgment

The basic undisputed "background" facts of this case (culled from the various statements of facts filed in support of the motions before the Court) are these:

The plaintiff, Harold L. Myron, is sixty years of age. Plaintiff served in the military for thirty years and retired from the United States Army as a full colonel in June 1973. From July 1973 through August 1, 1979 plaintiff was an employee of Trust Company Bank. Plaintiff retired from the bank due to total and permanent disability effective August 1, 1979. At the time of his retirement, plaintiff's basic salary with the Bank was $35,400 per year.

As a result of his military service, plaintiff became eligible for and began receiving military retired pay as of August 1, 1979. Effective April 1, 1978, plaintiff became eligible for and began to receive disability benefits from the Veterans Administration (VA). Effective September 1, 1979, plaintiff became eligible to receive 100 percent service-connected VA disability payments. Both of these payments have increased between the time of plaintiff's original eligibility and the filing of this suit.[1]

In May 1980, plaintiff was awarded social security benefits in the amount of $485.50

---

1. The exact breakdown of the payments plaintiff is receiving is apparently in dispute. Plaintiff asserts that his military retirement pay is offset by his VA payments. Defendants contend (by implication) that the two payments are separate and that there is no such offset. At any rate, the totals reflected in plaintiff's answer to interrogatory number 2 are greater than the "maximum monthly indemnity" (*see* below) for which he is eligible.

per month. Those benefits were awarded retroactively to January 1, 1980.

Plaintiff, as of March 31, 1981, was receiving VA disability, social security disability, and military retirement pay totaling at least $3,875 per month or at least $46,500 per year. Plaintiff's Answers and Objections to Interrogatories Nos. 1, 2, 3; Appendix Tab B, Great West's Appendix to Statement of Undisputed Material Facts.

Some time prior to 1976, Trust Company Bank initiated for its employees a long-term disability benefit plan. From July 15, 1975 through April 30, 1979, this plan was funded through an employee group long-term disability income insurance policy with Northwestern National Life Insurance Company (hereinafter "Northwestern").

In September of 1978, Great West submitted to Johnson & Higgins of Georgia, Inc. (an insurance consulting firm) a proposal containing its funding recommendation for a long-term disability insurance plan for Trust Company Bank. The basic provisions of this proposal were eventually accepted by Trust Company Bank as of May 1, 1979.

As of May 1, 1979, the Bank contracted with Great West to convert the funding of the plan to a self-funded program with claims adjudication and fund management services to be provided by Great West.

### The Issues

There are two key questions to be decided here:

(1) What are the terms of the Trust Company Bank Long-Term Disability Benefit Plan which are applicable to plaintiff?

(2) Should plaintiff's military retirement pay, VA disability payments and social security disability payments be deducted from any payments to which he may be entitled under the Bank's benefit plan?

Under the terms of the Bank's benefit plan, the "maximum monthly indemnity" that plaintiff is *eligible* to receive is $1,770 per month. This figure is equal to 60 percent of plaintiff's salary on the date of his disability, and is undisputed by the parties. What is disputed is how much of this $1,770 per month plaintiff is *entitled* to receive.

The center of the dispute is the following excerpt from the section of what, for now, will be called the original group disability insurance plan[2] entitled "Income From Other Sources":

The total of an Insured's "income from other sources" is deducted from his Gross Monthly Indemnity to determine his Monthly Income Benefits and includes the following:

(a) Any benefits the Insured and his dependents are eligible to receive because of the Insured's disability or age under the Federal Social Security Act, Public Employees' Retirement Association, Railroad Retirement Act or any other Federal, State, County or Municipal Retirement Act or Law
. . .

. . . .

(c) Any benefits the Insured is eligible to receive from a retirement plan, pension plan or other similar plan for which the Insured's past or present employer has directly or indirectly sponsored, or for which such employer has paid any part of the cost or has made a payroll deduction.

(d) Any benefits the Insured is eligible to receive under Workmen's Compensation or similar legislation or under any governmental or private disability income plan which provides benefits for loss of time from employment, for which the policyholder or the Insured's past or present employer contributes or makes payroll deductions.

Allison Deposition, Exhibit 15.

Plaintiff, in his original complaint, asserted that he is entitled to receive $1,284.50

2. The original plan is that plan under which the Bank was operating prior to the May 1, 1979 switchover from Northwestern to Great West. What actually constitutes "the Plan" is in dispute and the Court's characterization here is not a comment on the merits of that dispute, but rather is simply a convenient mode of reference.

per month from the Bank under the benefit plan. This figure represents the $1,770 maximum monthly indemnity less the $485.50 per month plaintiff initially received in social security disability benefits. Complaint, ¶ 16. In his amended complaint, plaintiff asserts that he is entitled to the entire $1,770 in monthly benefits under the Plan. First Amendment to Complaint, ¶ 16.

It is plaintiff's contention that his military retirement pay, his VA disability benefits, and (now, apparently) his social security disability benefits, should not be offset against his benefits under the Bank's plan. Plaintiff offers three theories to support his position. The first two are premised on the argument that "the plan" under which the Bank was administering its disability benefit program prior to May 1, 1979, and from which the above-quoted excerpt was taken, was terminated when the Bank switched insurance companies from Northwestern to Great West. Because the relevant ERISA section requires that every employee benefit plan be "maintained pursuant to a written instrument", 29 U.S.C. § 1102(a)(1), and because, under plaintiff's argument, the original plan was no longer binding, another "written instrument" must have set out the terms of the plan.

Consequently, plaintiff's first theory is that the Bank's application for insurance to Great West and Great West's acceptance letter constitute an insurance policy between the Bank and Great West, despite the fact that these documents are incomplete and contradictory, because "they more accurately reflect the status of the Bank's long-term disability plan as of May 1, 1979, than any other document which existed at that time." Plaintiff's Reply Brief at 9. As the application did not include any offsets for income from other sources or even refer to those offsets in the (as plaintiff characterizes it) "pre-existing Northwestern National policy", plaintiff argues he is entitled to the full disability payment of $1,770 per month.

Secondly, plaintiff argues that if the Court does not accept the application as being the controlling plan document, an initial draft prepared by Great West in December 1979 which was sent to the Bank through Johnson & Higgins for approval and/or comment constitutes the controlling plan document. This draft contained offset provisions which, plaintiff argues, would only encompass his social security payments, and, therefore, he would be entitled under this "plan" to the full monthly benefit less the amount of the social security payments.

Plaintiff's final theory is that even if the case is controlled by the "Northwestern National document", the relevant portions of which are set out above, the plaintiff is still entitled to disability benefits of $1,284.50 per month because his military retirement pay and VA benefits do not fit into the various categories of "income from other sources" listed in that document.

Plaintiff also seeks to recover damages under ERISA of $100 per day plus attorneys' fees due to the alleged failure of defendants to provide him with copies of the benefit plan in effect on the date of his disability. Finally, plaintiff seeks $100,000 in exemplary damages against defendants.

The position of all of defendants is simply that "the Plan" in effect prior to May 1, 1979 remained in effect with only two modifications which are irrelevant here [3] after the Bank switched insurance companies from Northwestern to Great West. It is their contention that the Plan itself is a separate entity from the insurance policy, and that all of the parties involved in establishing the new setup agreed that the provisions of the plan entitled "Long Term Disability for Employees of Trust Company of Georgia, et al.", Allison Deposition, Exhibit 15, were to remain in effect after May 1, 1979. It is asserted by defendants that the change to Great West merely altered the funding arrangement of the plan and not the plan itself, and that Great West was

---

**3.** These modifications dealt with a liberalized eligibility provision and an increase in the max- imum monthly benefit provided for by the plan.

simply to supply their administrative expertise in implementing the Bank's benefit plan.

The defendants argue that plaintiff's military retirement pay and VA benefits do fall under the "Income from other sources" offset provisions of that Plan; that because of this, plaintiff's income from other sources exceeds his total "Gross Monthly Indemnity" of $1,770, and that, therefore, plaintiff is entitled only to the $50 per month minimum payment provided for in the Plan.

Finally, defendants argue that because plaintiff was provided with a copy of the Plan in Exhibit 15, no ERISA violation occurred. Great West argues further that it was not the ERISA Plan administrator under the provisions of 29 U.S.C. § 1002(16) and that, therefore, it was under no obligation to supply plaintiff with a copy of the Plan as ERISA requires of the employer.

### The Standard

Under the terms of Federal Rule of Civil Procedure 56(c), a motion for summary judgment may be granted only if there is no issue as to any material fact and the law favors the moving party. *Marcus. v. St. Paul Fire & Marine Insurance Co.*, 651 F.2d 379, 382 (5th Cir. 1981).

As defendant Trust Company points out, despite the many statements of facts and statements of disputed facts filed in support of and in opposition to the motions in this case, no real material facts are disputed. The dispute is in the legal interpretation of the effect of the facts, and in which facts are decisive of the issues. Consequently, the case is ripe for summary judgment disposition.

### What is "The Plan"?

As noted above, all of the defendants contend that the document entitled "Long Term Disability for Employees of Trust Company of Georgia, et al." which contains the offset provisions at issue constitutes "the Plan" by which the outcome must be governed. They attempt to draw a distinction between the terms "plan" and "policy",

and argue that, although the *policy* was changed from one with Northwestern to one with Great West, the parties (*i. e.*, the defendants) all agreed that the *plan* which was in effect prior to the change in insurance companies was to remain in effect.

This argument cannot stand in light of the applicable ERISA provision. Twenty-nine U.S.C. § 1102 provides in relevant part:

> (b) Every employee benefit plan shall—
>
> (1) provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan and the requirements of this subchapter,
>
> (2) describe any procedure under the plan for the allocation of responsibilities for the operation and administration of the plan . . . ,
>
> (3) provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan, and
>
> (4) specify the basis on which payments are made to and from the plan.

As plaintiff correctly points out, the Northwestern "arrangement", of which the document defendants label "the Plan" was an integral part, expired by its own terms on April 30, 1979. Plaintiff's Brief at 3. That part of the Northwestern documents which contains the offset provisions cannot in and of itself be considered a "plan" under section 1102(b), because the first three elements listed in that section no longer existed when the arrangement between the Bank and Northwestern was terminated. "The Plan" does *not*, as the Bank argues, "continue[] in existence regardless of changes in funding or administration." Trust Company Reply Brief at 7. Section 1102 clearly shows that funding and administration are integral parts of a "plan" under ERISA. However, as will be set out below, the Court finds that this mistake in terminology is not fatal to defendants' position on the ultimate outcome of this case.

It is plaintiff's primary contention that the Bank's written application for insurance, which was accepted and administered by Great West as though a written policy had been issued, is "the Plan" which governs the disposition of this case. The application, Gill Deposition, Exhibit 19, does contain the four required features of an ERISA "plan" as set out in section 1102(b). There is also no mention of any offset provisions in the application, and, therefore, plaintiff argues that he is entitled to the full $1,770 per month disability payment.

If only the provisions of the application for insurance were relevant here, the Court would be inclined to rule for plaintiff. However, because of the admissible parol evidence existent here, the Court cannot do so.

Defendants' basis for asserting that the offset provisions set out in the plan which existed prior to the change to Great West is that all of the parties to the formulation of the new plan agreed that this would be the case. This contention is supported by the following evidence:

(1) The affidavit of Gregory Jon Allison, the group marketing officer of defendant Great West who negotiated the conversion on behalf of Great West, which states that:

> During the negotiations prior to and at the time the agreement was reached to commence coverage of the Plan under Great West's self-funding proposal, Great West and Trust Company Bank, through Mr. Hillegas [of Johnson & Higgins], agreed that the institution of this self-funding program would not alter the benefits available to employees under the Plan, and that the benefit provisions of the Great West policy would remain consistent with the existing Plan with only two minor exceptions [which were set out above]
>
> . . . .
>
> Allison Affidavit, ¶ 4, Appendix Tab C, Defendant Great West's Appendix to its Statement of Undisputed Material Facts.

(2) The affidavit of W. Moses Bond, a group vice president of defendant Trust Company Bank, who engaged Johnson & Higgins to consult with the Bank regarding the change in insurance companies and plan administration. He states:

> The intention of Trust Company Bank in the transition from a plan insured by Northwestern National Life Insurance Company to a self-funded plan was that the terms of the plan itself would remain unchanged. . . . Specifically, the terms of the Plan with respect to deductions for income from other sources and the calculation of monthly benefits were to remain unchanged.
>
> Bond Affidavit, ¶ 4, Trust Company's Motion for Summary Judgment Exhibit B.

(3) The affidavit of James T. Hillegas, a vice president of Johnson & Higgins, who was primarily responsible for providing that firm's services to Trust Company in the conversion and negotiation process. He states:

> The intention of all of the parties to the transition from Northwestern National Life Insurance Company to the new funding arrangement was that the terms of the Plan itself would remain unchanged . . . . Specifically, the terms of the Plan with respect to deductions for income from other sources and the calculation of monthly benefits were to remain unchanged.
>
> Hillegas Affidavit, ¶ 9, Trust Company's Motion for Summary Judgment, Exhibit C.

(4) The deposition testimony of Betty J. Gill, claims manager for Great West, who was informed at the time of the conversion that the terms of the Northwestern Plan were to be "duplicated" in the Great West Plan. Gill Deposition, pp. 45–46.

Plaintiff argues that these statements should not be accepted by the Court because

the application which the Bank sent to Great West contained the following language:

It is hereby declared and agreed that all statements, representations and answers made in this application are a consideration for and a basis of the contract(s) of insurance between the Applicant and the Company and whether written or printed are declared to be true, full and complete; that no other statement, representation, or information shall be binding upon or affect the rights of the Company . . . .

Plaintiff asserts that this language constitutes a merger clause that clearly bars the incorporation of the offset provisions of the Northwestern plan into the Great West plan, because there is no mention of or reference to those provisions in the application. Plaintiff notes further that other portions of the Northwestern plan were specifically referred to in the application. Plaintiff's Brief at 3–4. Plaintiff, however, has offered no evidence to rebut the statements of the various affiants.

In the first place, as the Bank points out in its reply brief at page 11, the clause in question is not really a merger clause. It says that Great West is not bound by any statement not contained in the application, and it says that "all statements, representations and answers" made in the application are "true, full and complete." The clause does not state, as does the merger clause in *Johnson v. Ford Motor Credit Co.*, 142 Ga. App. 547, 548, 236 S.E.2d 527 (1977), cited by plaintiff, that "[t]his contract constitutes the entire agreement between the parties . . . ."

■ It is well settled in both Georgia and federal law that the evidence in the affidavits and depositions can be considered in a situation such as this. Georgia Code Ann. § 20–704(1) states:

Parol Evidence is inadmissible to add to, take from, or vary a written contract. All the attendant and surrounding circumstances may be proved, and if there is an ambiguity, latent or patent, it may be explained; *so if a part of a contract only is reduced to writing . . . , and it is manifest that the writing was not intended to speak the whole contract, then parol evidence is admissible.*

(Emphasis added.)

Georgia case law is even more clear on this point. The case of *Forsyth Manufacturing Co. v. Castlen*, 112 Ga. 199, 211, 37 S.E. 485 (1900), held that

a party is at liberty to prove "the existence of any separate oral agreement as to any matter on which a document is silent, and which is not inconsistent with its terms, if from the circumstances of the case the court infers that the parties did not intend the document to be a complete and final statement of the whole of the transactions between them."

(Citation omitted.) *Accord, Hatley v. Frey*, 145 Ga.App. 658, 659, 244 S.E.2d 604 (1978); *Ansley v. Forest Services, Inc.*, 135 Ga.App. 745, 747, 218 S.E.2d 914 (1975). *See also Langenback v. Mays*, 205 Ga. 706, 711, 54 S.E.2d 401 (1949).

Plaintiff himself points out that the application is "silent" as to the offset provisions. As there is admittedly no reference to these provisions, there is no way they can be considered "inconsistent" with the terms of the Trust Company-Great West contract. Finally, the "circumstances of the case"—*i. e.*, the aforementioned affidavits, the lack of many necessary terms and provisions in the application itself, and the fact that several draft plans have arisen during the course of this action—certainly allow the Court to infer that the defendants "did not intend the document to be a complete and final statement of the whole of the transactions between them."

Federal law also supports consideration of this evidence. The Fifth Circuit has held that "[i]n Georgia, construction of insurance contracts begins with the premise that a policy must 'be construed so as to carry out

the true intention of the parties. All other rules of contract interpretation and construction are subservient to that principle . . . .' " *National Hills Shopping Center, Inc. v. Liberty Mutual Insurance Co.,* 551 F.2d 655, 657 (5th Cir. 1977) (citation omitted). Furthermore,

> Extrinsic evidence may be even more helpful in deciding whether there has been an integration, and no rule bars "parol evidence" or any other relevant evidence for the purpose of determining whether the parties have agreed upon the writing as a complete and accurate statement of what is agreed between them.

*Carolina Metal Products Corp. v. Larson,* 389 F.2d 490, 493 (5th Cir. 1967). *See also Vanston v. Connecticut General Life Insurance Co.,* 482 F.2d 337, 341 (5th Cir. 1973) (parol evidence rule did not prevent plaintiff from proving additional insurance contract terms which were not inconsistent with those embodied in the written agreement); *Matthews v. Drew Chemical Corp.,* 475 F.2d 146 (5th Cir. 1973).

█ The true intention of the parties to the insurance contract here was obviously to follow the offset provisions set out in the original Northwestern plan. Therefore, that is what the Court will allow. The Court FINDS that the plan which governs here is the combination of the application by the Bank to Great West and the benefit provisions of the original Northwestern plan (and not "the Plan" as defendants refer to it) which the defendants intended to be carried over into the new Great West plan. In particular, the Court HOLDS that the relevant offset provisions for "income from other sources" are those provisions contained in the original Northwestern plan set out above.

### ERISA Violations

█ While it is true that 29 U.S.C. § 1102(a)(1) requires that every employee benefit plan "shall be established and maintained pursuant to a written instrument", the Court has found no authority that states that this written instrument must be one all-inclusive document. Indeed, the legislative history indicates that Congress contemplated the possibility of more than one writing constituting an ERISA plan. The conference committee report states: "A written plan is to be required in order that every employee may, on examining the *plan documents,* determine exactly what his rights and obligations are under the plan." 1974 U.S.Code Cong. & Ad.News, 4639, 5077–78 (emphasis added). Certainly, the statement in the application which plaintiff erroneously designated as a merger clause could cause confusion to a plan beneficiary as to whether the Northwestern plan benefit provisions apply under the Great West plan. It is also true that "the plan" the Court has found to be controlling here is not a fully complete one, as evidenced by the fact that several subsequent draft plans have arisen and none has as yet been accepted as *the* final benefit plan. However, no employee of the Bank was ever told that any other provisions would apply, and the employees, including plaintiff, were furnished with copies of the Northwestern plan benefit provisions. Therefore, although the "written instrument" requirement was not met as perfectly as it could have been, the Court FINDS that there was no violation of this ERISA provision. *Cf. Johnson v. Central States, Southeast & Southwest Areas Pension Fund,* 513 F.2d 1173 (10th Cir. 1975) (though pension plan description in booklet furnished employee, together with plan itself, was unsatisfactory, pension fund did not violate Welfare and Pension Plans Disclosure Act).

█ As the Court has set out "the plan" which is determinative of this case, and since defendants provided plaintiff with copies of both the Northwestern plan and the application which together contain all of the aspects of the Plan relevant to this action, the Court HOLDS that there was no violation by defendants of 29 U.S.C. § 1132 for "refusal to supply requested information."

*Do the Offset Provisions Apply to
Plaintiff's Military Retirement
Pay and VA Benefits?*

The Court has decided that the offset provisions in the Northwestern plan document govern the disposition of this case. Plaintiff does not deny that the social security benefits he receives are covered by those offset provisions. Indeed, he acknowledges that the maximum monthly benefit he is entitled to under the controlling document is $1,284.50—the $1,770 maximum less the $485.50 he was initially eligible to receive in social security benefits. Plaintiff's Brief at 12. Therefore, the Court must determine if plaintiff's military retirement pay and VA disability payments are covered under the plan's offset provisions.

The Court will first deal with the military retirement pay, because if those benefits are covered by the offset provisions, plaintiff would be over his $1,770 maximum monthly benefit regardless of whether the VA benefits are offset from the retirement pay or added to it.

■ The Court need look no further than the language of subsection (c) of the offset provisions, which states: "Any benefits the insured is eligible to receive from a retirement plan, pension plan or any other similar plan for which the Insured's past or present employer has directly or indirectly sponsored, or for which such employer has paid any part of the cost or has made payroll deduction ..." will be offset as "income from other sources" from benefits provided under the Bank's plan.

Plaintiff makes three arguments against the applicability of this section to his military retirement pay. The first two—that "[o]ffset (c) is, by its terms directed to retirement and pension plans (*i. e.*, private retirement and pension arrangements established by a trust or other plan document)

of the type typically covered by ERISA," Plaintiff's Brief at 14, and that offset (c) is "related to private retirement and pension plans" and does not "relate to governmental retirement acts or laws", *Id.* at 16—are simply not supported by the language of the offset provision. The court finds no distinction in (c) between plans established by a public employer and plans established by a private employer. Finally, plaintiff makes a creative argument that the, as he calls them, "limited offsets provided by subparagraphs (a) and (d)" would be rendered meaningless by giving a broad interpretation to offset (c) which would include the military retirement pay in question. Plaintiff's Reply Brief at 16–18. The Court is simply not persuaded that the construction given to these terms by plaintiff is correct.

The Court FINDS that the language of paragraph (c), above, clearly encompasses the military retired pay plaintiff is receiving. The benefits plaintiff is receiving are from a "retirement plan" for which plaintiff's past employer—The United States government—has paid *all* of the cost.[4]

Finally, the Court notes that plaintiff has filed a "notice of deposition upon written questions" for Mr. Marvin Lind, Director of Life and Disability of Northwestern National Life Insurance Company. Plaintiff's attorney indicates in his affidavit that he "has obtained [from an unnamed source at Northwestern] an oral interpretation indicating that the plaintiff's military retirement income would not be offset by Northwestern National against his basic disability benefit." Sims Affidavit, ¶ 4, Plaintiff's Appendix Tab 2. Apparently the deposition testimony plaintiff hopes to obtain from Mr. Lind seeks in part to verify this assertion. *See* "Plaintiff's Direct Examination" question 18.

The Court is not convinced that this testimony is relevant enough to its decision here to await completion of this deposition testi-

---

**4.** The Court also finds that the language in the provision in question is much more specific than that in the plan dealt with in *Gladden v.*

*Pargas, Inc. of Waldorf, Md.*, 575 F.2d 1091 (4th Cir. 1978), cited by plaintiff, and, therefore, that case's holding is of no bearing here.

mony. It was clearly the intention of the parties to the Great West plan that plaintiff's retirement pay be considered "income from other sources", *see* quoted sections of affidavits set out above, and the Court has found that subsection (c) can reasonably be interpreted to so include those benefits.

Therefore, as the Court has decided that plaintiff's military retired pay is covered by the Plan's offset provisions, and since at all times relevant to this action, plaintiff's combined social security benefits and military retired pay was greater than the $1,770 maximum monthly benefit for which he is eligible,[5] the Court HOLDS that plaintiff is only entitled to receive the $50 per month minimum benefit under the Bank's disability plan.

Also, as defendants have prevailed on the substantive issues, plaintiff's claims for attorney's fees and exemplary damages must also fail.

In sum, for the reasons set out in this opinion, the Court hereby:

GRANTS plaintiff's motion to amend complaint;

GRANTS all defendants' motions for summary judgment; and

DENIES plaintiff's motion for summary judgment.

---

**5.** Plaintiff became eligible for benefits under the Plan on February 1, 1980. At that time he was (retroactively) receiving $485.50 per month in social security benefits and $1,642.86 per month in military retirement pay ($2,785.86 less $943.00 in VA benefits) for a total of $2,128.36 per month in income from other sources.